UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>DANTE JOHNSON (JUV),<br><br>Defendant. | 3:19-CR-30001-RAL<br><br><br>OPINION AND ORDER<br>ON GOVERNMENT'S<br>MOTION TO TRANSFER |

The Government filed a Juvenile Information charging Dante Johnson with second degree murder, assault with a dangerous weapon, and using and carrying a firearm during and in relation to a crime of violence. Doc. 1. Each of those charges arise out of Dante Johnson's shooting and killing of Marcus Antonio on January 12, 2019, in Eagle Butte, South Dakota. To distinguish between the juvenile defendant Dante Johnson and other Johnson family members, this Opinion and Order will refer to Dante Johnson and other Johnson family members by their first names. The location where Dante shot Marcus Antonio is in "Indian country," and Dante is an "Indian" by virtue of being enrolled in the Cheyenne River Sioux Tribe and being 13/32 American Indian by blood.[1] Tr. Ex. 1.

---

[1] The word "Indian" has acquired a legal meaning through the course of this nation's history. The origin of the word "Indian" to refer to the indigenous population of the Americas stems from the mistaken belief of a few early European explorers to North America that they had encountered the East Indies. The word "Indian" became engrained in case law and statutes, including the statute providing federal jurisdiction here, 18 U.S.C. § 1153. See F.T.C. v. Payday Fin., LLC, 935 F. Supp. 2d 926, 929 n.1 (D.S.D. 2013).

The Government filed a motion to transfer the proceedings to adult criminal court under 18 U.S.C. § 5032. Doc. 19. Dante opposed the motion. Doc. 98. On November 26 and 27, 2019, this Court held a two-day evidentiary hearing during which it heard testimony from twenty-nine witnesses in person, accepted by stipulation transcribed testimony from two other witnesses, and received multiple exhibits into evidence. At the close of the evidentiary hearing, this Court discussed that both the Government through Exhibit 1 and Dante through Exhibit A and testimony of Dante's expert presented information summarizing what Dante and eye witness Lennox Smith had said in recorded interviews to a Federal Bureau of Investigation (FBI) agent. This Court discussed with counsel receiving into evidence for purposes of the transfer hearing the recorded FBI interviews of Dante and Smith so as to have that information in an unfiltered manner. Neither side objected at the time of the transfer hearing to the Court receiving into evidence and considering the audio recordings of Dante and Smith's FBI interviews, but defense counsel objected after the hearing. Doc. 109. This Court overruled the objection though made clear, in light of defense counsel's objection, that it would only consider the Smith audio recording "to determine which account of Smith's statements—the Government's in Exhibit 1 or the defense expert's in Exhibit A or both or neither—to credit" when evaluating the nature of the alleged offense and not for the truth of matters asserted. Doc. 110. This Court now has listened to both audio recordings and considered all of the evidence.

## I.    Legal Standard

Under the Federal Juvenile Delinquency Act, there is a "general rule that juveniles should not be prosecuted as adults in federal court." United States v. I.L., 614 F.3d 817, 819 (8th Cir. 2010) (interpreting 18 U.S.C. § 5032). An exception to this general rule applies if "the juvenile is at least fifteen years old, the juvenile allegedly commits after [his] fifteenth birthday what would

be a felony crime of violence were [he] an adult, and transfer is in the interest of justice." Id. For purposes of a transfer hearing, a court may assume that the alleged offenses were committed. United States v. Juvenile LWO, 160 F.3d 1179, 1180 n.1 (8th Cir. 1998). Dante was sixteen years, seven months, and twenty-one days old when he shot and killed Marcus Antonio, and the charged offenses, if committed by an adult, would be felonies that are crimes of violence.

The difficult question presented here is whether transfer of Dante's case to adult court would be "in the interest of justice." See 18 U.S.C. § 5032. The factors to apply when considering "the interest of justice" are: "(1) the age and social background of the juvenile; (2) the nature of the alleged offense; (3) the extent and nature of the juvenile's prior delinquency record; (4) the juvenile's present intellectual development and psychological maturity; (5) the nature of past treatment efforts and the juvenile's response to them; and (6) the availability of programs designed to treat the juvenile's behavioral problems." United States v. Juvenile Male, 889 F.3d 450, 453 (8th Cir. 2018). Throughout this inquiry, "the court must balance the likelihood of rehabilitation before the juvenile reaches majority with the risk of harm to the public from treating violent crime more leniently." United States v. Juvenile JG, 139 F.3d 584, 586 (8th Cir. 1998). "[T]he district court is not required to afford equal weight to each factor, however, and instead may balance them as it deems appropriate." United States v. SLW, 406 F.3d 991, 993 (8th Cir. 2005) (alteration in original) (citation and internal quotation marks omitted). The Government has the burden of proving transfer is appropriate by "only a preponderance of the evidence" because a transfer hearing is a "civil proceeding which results in an adjudication of status." United States v. Parker, 956 F.2d 169, 171 (8th Cir. 1996).

With this legal standard in mind, this Court turns to the facts established by the preponderance of the evidence from testimony and exhibits at the evidentiary hearing. This Court endeavors to set forth the facts in somewhat of a chronological order.

## II.    Facts Relevant to Transfer Determination

Dante Tyrone Johnson was born on May 23, 2002. Dante's mother is Tyanne Johnson, and his father is Carlin Jimi Jewett, Junior. According to the records of the South Dakota Department of Social Services (DSS), Dante during his preschool years was in the home of his maternal grandmother Vivian Johnson, where other young adults lived and where Vivian raised other grandchildren. Tr. Ex. 3. Dante's father was not actively involved in Dante's upbringing, and Dante's mother Tyanne episodically took responsibility for caring for Dante. Testimony during the transfer hearing and Cheyenne River Sioux Tribe's court records indicate that Dante's primary caregiver was his grandmother Vivian, but that Dante bounced from home to home particularly during middle school and high school, living at times with his paternal grandmother Delima Brown Wolf, a woman named Marti Bowker, an older relative named Andrew Slow Bear, and perhaps Slow Bear's mother Sharon, and with Dante's aunt Tannya Johnson.

Vivian reportedly struggled with alcoholism, and DSS records reflect concerns about possible neglect of Dante and other children in the home from as early as when Dante was four years old. Tr. Ex. 3. DSS never took custody of Dante. DSS records tended to focus more on Dante's cousin, a child three and a half months younger than Dante with the initials B.R.B. However, DSS records from February 28, 2012 (when both Dante and B.R.B. were nine years old) reported that Dante told "a parent of another student that he preferred to stay away from his cousin [referring to B.R.B.] because his cousin hurt him physically and sexually." Id. When interviewed by DSS, Dante reported that B.R.B. punches him and other kids in Vivian's home. More recent

DSS records note Dante's irregular school attendance in eighth grade in August of 2016 and his arrest on certain tribal charges in June of 2017. Id. By June of 2017, Vivian had told DSS that she no longer had custody of Dante, and Dante's father had been indicted on federal charges in the District of South Dakota. Id. DSS was concerned in June of 2017 that no one was available to pick up Dante when he was released from the juvenile detention center of the Cheyenne River Sioux Tribe. Id. The final DSS record from January of 2018 related to concerns of Dante being in the custody of Andrew Slow Bear, having received an out-of-school suspension for fighting, not having returned to school, and having been arrested as a part of a drug bust at the Slow Bear home. Id.

Dante's school records from the Cheyenne-Eagle Butte school system reflect his attendance for at least parts of every year between September of 2007 and January of 2019. Dante transferred to Rapid City in March of 2009 for the end of his first-grade year, but he was back for second grade at Cheyenne-Eagle Butte. Dante transferred for approximately two weeks during his fifth-grade year to Grand Island, Nebraska, where his mother Tyanne was living at the time, but he was back to Eagle Butte within the same month to complete fifth grade. Dante was dropped from eighth grade in April of 2016 for a string of consecutive days absent, but then transferred to an alternative school program within the district called the Eagle Center. After not attending school in August or September of 2016, Dante was placed back into eighth grade in October of 2016, and completed it the next May. Dante was in high school at Cheyenne-Eagle Butte High School beginning with his ninth-grade year in August of 2017, until he was suspended during tenth grade on January 11, 2019, one day before the shooting of Marcus Antonio on January 12, 2019.

School counselor Jill Kessler testified generally about the Behavior Detail Reports for Dante from the Cheyenne-Eagle Butte school system. Those records reflect 63 disciplinary events

for Dante from 2013 through 2019. Tr. Ex. 2. Thirty-six such disciplinary records cover a wide range of misbehavior characterized as "insubordination." Id. Seven times Dante was formally disciplined for being "disruptive in class." Id. On four occasions, the discipline related to "fighting," and on another occasion to a physical altercation. Id. Dante received various in-school suspensions, and a total of seven out-of-school suspensions as follows: March 6, 2014, two days for fighting; March 8, 2015, two days for fighting; February 11, 2016, two days for fighting; April 20, 2017, five days for drugs; September 27, 2018, one day for disruptive classroom behavior; October 4, 2018, one half day for tobacco at school; January 11, 2019, three days for fighting. Id. Dante had seven behavior detail reports during his partial tenth-grade year, ten behavioral detail reports during his ninth-grade year, seven reports during his second year in eighth grade, twelve behavior detail reports during his initial year in eighth grade, and nine behavior detail reports during his seventh-grade year. Id.

Dante's attendance at school varied between poor and fair. Dante's academic performance varied widely. He did very well in receiving A's and B's during the first three semesters of his second year in eighth grade, and earned an excellence honor award for the third quarter of 2017. Dante, however, received principally D's during his ninth-grade year, and a mix of grades, including two F's, two D's, one C, and one B during his partial tenth-grade year. Id.

Of course, Behavior Detail Reports and school records present only a partial picture of any student, and this Court had the benefit of hearing about Dante from multiple witnesses who worked in and with the Cheyenne-Eagle Butte school system. Cora Peterson, the principal of the upper elementary school at Eagle Butte, observed Dante from grades three to six and viewed him as a normal student without major behavioral problems. Joan Upell taught Dante English in eighth grade and found him to be a friendly and excellent student with good reading and writing ability.

6

Upell described her four write-ups of Dante for "insubordination" as typical write-ups for an eighth-grade boy to which Dante responded positively. Angel Lee, the education specialist/dean of students, who coincidentally has a child with Dante's father, spoke glowingly about Dante through long narrative answers, disclaiming that Dante was responsible for any of the fighting incidents and saying that Dante did not present himself as a gang member.

Less biased educators than Lee presented a more nuanced picture of Dante and his behavior. Emmanuel Red Bear, a Lakota language and culture teacher, had Dante as a student in 2017–18. Despite writing Dante up a couple of times, Red Bear had no particular problems with Dante or any other student. Red Bear, however, knew that Dante affiliated with those wearing the color blue (or commonly the Crips) and had conflict with those who wore red (or commonly the Bloods) in the school.[2] Similarly, the food service manager Stacey Lee knew Dante from the lunch line and found him to be respectful and friendly, without having caused trouble in the cafeteria. Lee observed those wearing red (whom she associated with more sheltered kids in Bureau of Indian Affairs housing) were in conflict with those wearing blue (whom she said were typically from a neighborhood of Eagle Butte commonly called "the dark side" for the lack of street lights). Likewise, paraprofessional Jordan Stoddle found Dante to be respectful, but noted that a lot of kids did not like Dante. Stoddle was instructed to shadow Dante for his own safety as Dante held himself out as affiliated with the gang wearing blue and was subject to bullying. A couple of

---

[2] Through the years, this Court has become familiar with teenagers and young adults on the Cheyenne River Reservation and elsewhere affiliating with gangs through wearing gang colors and flashing gang signs. These are at most loose affiliations with the Crips, Bloods, Gangster Disciples, Surenos 13, and the like, and do not involve participation in organized criminal activities of those actual gangs. Were it not for the periodic violence in South Dakota between and among boys and young men affiliated with these gangs and how serious some take their gang affiliations, this Court would view these youngsters as misguided want-to-be gang members looking for some sense of community or friend group. Mere affiliation with such a gang of course does not justify granting transfer of a juvenile case to adult court.

educators spoke of an instance where "F _ _ _ Dante"[3] was written on a wall of the school and quickly cleaned up afterwards.

The high school social worker, Susan Eagle Staff, knew Dante primarily through her work at the school but had a sense of Dante's home life as a neighbor of Vivian. When Dante was absent from school, Eagle Staff learned that he was living at the Andrew Slow Bear residence and had no idea why he was living there. When Eagle Staff talked with Dante at a tribal court hearing about his living arrangement, Dante (age fourteen or fifteen at the time) said that he was old enough to take care of himself. Eagle Staff observed Dante to hang out with adults after school and have some friends that were negative influences on him. Dante did not undergo separate counseling or receive any referrals for counseling to Eagle Staff's knowledge.

School counselor Jill Kessler found Dante to be intelligent, quiet, and compliant in dealing with her. Kessler observed that Dante's first instinct was survival and that he bounced around between homes. Kessler testified that in her thirteen-year career, she has only been fearful of two students, and Dante was not one of those two students. Kessler acknowledged that Dante had called teachers some very crude names and that not every teacher had the experience of compliance like Kessler had received from Dante.

Dante had some history with arrests and juvenile cases with the Cheyenne River Sioux Tribe (CRST). His incarceration record at the CRST Juvenile Services Center, Tr. Ex. 5, lists nine periods of incarceration including the following:

| DATE | PRINCIPAL CHARGE | TIME OF INCARCERATION |
|------|-----------------|----------------------|
| 3/30/15 | Disorderly Conduct | 4 ½ hours |
| 5/27/15 | Possession of Alcohol & Criminal Mischief | 4 ½ days |

---

[3] The full profanity was written on the wall.

| 8/1/15 | Arson | 9 hours |
|--------|-------|---------|
| 6/19/16 | Possession of Alcohol | 3 ½ hours |
| 10/5/16 | Possession of Alcohol & Disorderly Conduct | 1 day |
| 10/8/16 | Pickup and hold | 1 day |
| 6/3/17 | Criminal Mischief | 2 days |
| 7/7/17 | Possession of Alcohol | 16 hours |
| 1/3/18 | Drug Related Charges | 5 days |

Arrests of course are not the same as adjudications of juvenile delinquency. The CRST tribal court juvenile records were a bit difficult to comprehend but appear to involve seven separate files resulting in three adjudications. Tr. Exs. 4A, 4B, 4C, 4D, 4E, 4F, and 4G. One such adjudication in case number 15-JP-345 involved a reckless burning charge where a financial obligation and three months of probation were the disposition. Tr. Ex. 4C. In case 15-JP-135, Dante had to write an apology letter to CRST Law Enforcement Officer Kirby Blue Coat as the disposition. Tr. Ex. 4A. In a combination of cases 18-JP-055 and 056, Dante received six months of probation on drug charges plus bore some financial obligations. Tr. Exs. 4E, 4F. One case involved truancy in violation of the CRST School Attendance Law. Tr. Ex. 4G. Two other case files appear to be dismissed because a police report was not filed. Tr. Exs. 4B, 4D.

Jon Little Wounded was the CRST juvenile probation officer who supervised Dante. Dante was considered "low risk" on initial files and "high risk" on the last file until supervision was imposed. Little Wounded met with Dante six times during his initial three months of supervision, had a single contact with Dante regarding the apology letter to Officer Blue Coat, and had four contacts with Dante during the later six-month supervisory period, which ended early because

Dante moved to Tennessee with his mother during the summer of 2018. Little Wounded found Dante to be polite and well-mannered and one of the better kids he supervised.

Officer Donnie Mitchell is the CRST Law Enforcement officer who serves as the school resource officer and is assigned to patrol and be present at the school. Officer Mitchell was aware that Dante associated with the blue gang, that someone wrote "F_ _ _ Dante" on a wall, and that Dante had been threatened by peers. In particular, on September 27, 2018, Dante was in a standoff with three boys wearing red, where one of the boys threatened to kill Dante. Officer Mitchell found that Dante listened to him and was a good kid one-on-one. On Friday, January 11, 2019, there was an incident between Dante and another student at the school. Officer Mitchell reviewed video surveillance and saw Dante push another student to instigate the confrontation. Later, the other student, a boy wearing red, came after Dante, prompting a school administrator[4] to step in to separate them. Both Dante and the other student received out-of-school suspensions on January 11, 2019.

In January of 2019, Dante was living with his aunt Tannya. Dante was upset when he showed Tannya the note formalizing his suspension from school on Friday, January 11, 2019. On Saturday, January 12, 2019, Dante had dinner with Tannya who thought that his mood was alright. Dante had prescription glasses at the time, but they were broken. Dante's medical records, which are otherwise unnoteworthy, confirmed his significantly myopic vision.

On the evening of January 12, 2019, Dante and some other male juveniles obtained rum and other alcohol and were drinking at Tannya's home. Dante had a double-barreled handgun in his pants[5] and had shown it to the other boys. One of the other boys who was drinking alcohol

_____

[4] Angel Lee was that school administrator. Lee acknowledged that she had not seen the prior incident where Dante pushed the same boy.
[5] Dante told the FBI that his father gave him the gun for his personal protection.

with Dante was fifteen-year-old Lennox Smith. Sometime after dark, Dante and Smith took alcohol with them to the home of Dante's then-girlfriend Evanda Knife, who lived at No. 685 in No Heart housing in Eagle Butte. Dante and Smith continued drinking in Evanda's bedroom with another juvenile female. Evanda, who reportedly was pregnant possibly with Dante's child, drank alcohol, and Dante became angry and reportedly struck Evanda. Dante then crawled out of Evanda's bedroom window, and Smith and the other juvenile female followed Dante into the yard. Dante pointed the gun to his head and threatened to shoot himself. Perhaps because the juvenile female was pulling Dante's hand and gun away from Dante's head, a single shot rang out from the handgun.

Twenty-four-year-old Marcus Antonio and others were in a home at No. 684 in No Heart housing, the home next to where the shot was fired. Upon hearing the gunshot, Marcus Antonio came out his back door, followed by Danielle Antonio. Marcus Antonio yelled at Dante and the others about what they were doing and told them to leave. Marcus Antonio may have had a red bandana hanging from his pants pocket. The Antonios did not know Dante or Smith, and Dante and Smith did not know the Antonios. Smith told the Antonios to just go back inside. When Marcus Antonio took a step forward, Dante aimed the handgun using two hands and shot Marcus Antonio in the chest. Marcus Antonio staggered into his kitchen, collapsed, and died. CRST Law Enforcement received a dispatch call of a shooting at No. 684 in No Heart housing at 11:28 p.m., responded at 11:34 p.m., and found Marcus Antonio nonresponsive. By midnight, Marcus Antonio was pronounced dead.

After the shooting, Dante reportedly threatened Smith with the gun unless Smith went with him. Dante reloaded the gun after he and Smith left the area. Eventually Dante and Smith ended up at Andrew Slow Bear's trailer. Javonte Childs, who on the CRST reservation was known as

11

Louie Baggs (Baggs), testified to what occurred there.  Baggs knew Dante previously as being Slow Bear's younger brother.  Within thirty minutes of Dante arriving at the Slow Bear trailer during the early morning hours on January 13, 2019, Dante got into an altercation at the home. Dante pulled the gun and aimed it around the room left to right and then right to left at everyone. Baggs successfully deescalated the situation by telling Dante to stop tripping, carefully lowering Dante's hands with the gun and taking the gun from Dante's hand, removing the bullets from the gun, and then handing the gun off to someone else.

Owen Marshall, who was 12 years old at the time, was present at the Slow Bear residence that night.  His recorded interview with an FBI agent was admitted into evidence in place of his live testimony.  In his interview Marshall explained that Dante showed up at the home that night kind of drunk, and that Dante was crying and said that he shot somebody in No Heart.  Marshall told Dante that they didn't want that around and told him to head out.  According to Marshall, Dante didn't leave right away, but was only at the residence between ten and twenty minutes.

Baggs gave Dante and two other guys (Smith and likely an individual named Dakota who was not present for the shooting) a ride back and dropped them off in the No Heart housing community.  After going to various other places in and around Eagle Butte, Smith separated himself from Dante and later interviewed with law enforcement.  Dante fled to Rapid City where he was arrested a few days later.

Dante has been in custody since his arrest in Rapid City.  His behavior in custody, like his behavior in school, has been a mix of good and bad.  The teachers who go to Hughes County Jail to work with juveniles—Brian Bonhorst, Steven Steele, and Jill Kokesh—all find Dante to be respectful, intelligent, and diligent as a student.  None of those three have witnessed any behavioral issues with Dante.

However, correctional officers have had some difficulties with Dante. On June 29, 2019, at 5:50 p.m., a correctional officer viewing video cameras saw Dante chasing another inmate around a table and then punching that inmate in the face once while the inmate was trying to get back to his cell. Dante had a swollen hand after this incident, and the other juvenile inmate had a bloody nose, bruised eye, and scratches on his back. The correctional officer, who has had no other issues with Dante, later heard that the other inmate was aggressive first.

In November of 2019, Dante was encouraging another juvenile inmate to call a female jailer a profane slur. That female correctional officer on November 25, 2019, had an incident in the pod where Dante and three other juveniles were housed where she believed Dante to give a signal to another juvenile to impede her movement in the pod. Dante had impeded her movement in the pod previously as she sought to clear trays from the pod. Other correctional officers found Dante to be a model inmate.

Dante during the transfer hearing had his right hand in a cast; shortly before the transfer hearing, Dante fractured his hand in a fight while in custody. Apparently, another juvenile detainee known to be cocky began to exchange words with Dante and shoved Dante, to which Dante responded by hitting him in the face.

The defense expert Dr. Dewey Ertz, a psychologist well known to this Court, conducted a forensic psychological evaluation of Dante. Dr. Ertz reviewed case material and met with Dante on June 2 and November 10, 2019. Dr. Ertz evaluated Dante as having a full-scale IQ score of 94. Tr. Ex. A. Dr. Ertz used a series of tests and determined that Dante has post-traumatic stress disorder with dissociative symptoms, other specified trauma and stressor-related disorder, and major depressive disorder of a recurrent and severe nature. Id. Dr. Ertz also diagnosed alcohol use disorder of a severe nature, cannabis use disorder of a severe nature, adolescent antisocial

behavior, and a personal history including physical and sexual abuse, neglect, and psychological abuse in childhood. Id. Dr. Ertz's report and testimony made clear that he believes that this Court should not transfer the case.

Counsel jointly submitted testimony from Bureau of Prisons (BOP) official Carl Leukefeld about BOP contracting for services for juveniles. Tr. Ex. 7; Tr. Ex. C. The BOP presently contracts with three secure facilities in which twenty-nine juveniles adjudged delinquent in federal courts are housed. The three secure facilities include Western South Dakota Juvenile Services Center in Rapid City, South Dakota, as well as one location in Texas and one in Pennsylvania. The BOP contracts with just three non-secured facilities—two Our Home locations in South Dakota, and the North Dakota Youth Correctional Center in Mandan. The majority of federal juvenile defendants come from North Dakota and South Dakota, based on the Indian country jurisdiction in those states. If sentenced as an adult, Dante would transfer out of any juvenile secured facility on his eighteenth birthday into the adult BOP population. If dealt with as a juvenile, Dante could be held only up to his twenty-first birthday in a juvenile secured facility. There presently are a couple of federal juvenile inmates adjudged delinquent based on murder convictions.[6]

---

[6] There are several recent cases within the District of South Dakota where juveniles older than fifteen who committed murders were treated as juveniles and ended up in BOP custody as juveniles. See, e.g., United States v. H.I.H., 3:18-cr-30089-RAL *SEALED* (D.S.D. Jan 18, 2019); United States v. J.K.E., 5:15-cr-50047-JLV *SEALED* (D.S.D. June 12, 2017); United States v. E.W.O., 5:16-cr-50029-JLV *SEALED* (D.S.D. May 31, 2017); United States v. S.E.B., 5:09-cr-50120-JLV *SEALED* (D.S.D. Nov. 29, 2011). This Court, however, has transferred to adult court one murder case where the "interest of justice" factors justified transfer, and sentenced the particularly dangerous young man who committed the murder to 48 years in prison, United States v. Boneshirt, 3:10-cr-30008-RAL (D.S.D. Sept. 15, 2010). The "interest of justice" factors land this case between the H.I.H. case and the Boneshirt case; this Court does not view Dante as being nearly as deviant and dangerous as the defendant in Boneshirt, but believes Dante to be more dangerous than the defendant in H.I.H.

The parties jointly submitted the testimony of Heather Heinert (Heinert), a case manager for the Western South Dakota Juvenile Services Center in Rapid City (JSC), about her twenty years of experience working with federal detainees under BOP contract. Heinert believed that two federal juveniles are presently incarcerated at JSC on homicides, both having committed the homicide after reaching age sixteen. Dr. Ertz is the psychologist who provides weekly counseling services to juveniles at JSC.

Dante underwent an interview with an FBI agent after his arrest. Following waiver of his Miranda rights, Dante initially disclaimed remembering anything after getting a ride to his girlfriend's home, drinking, getting mad over something, and wanting to shoot himself. Dante originally said he had no memory between having the gun to his head outside of his girlfriend's house and waking up at his father's house the next morning before fleeing to Rapid City. Dante's statements later in the interview revealed that he in reality remembered quite a bit about the shooting and his conduct thereafter.

During the interview Dante talked of receiving the double-barreled handgun a week before from his father because others had threatened to kill him. Dante acknowledged his gang affiliation and his recent suspension from school the day before the shooting. Dante also recollected who gave him rides in the hours following the shooting. After being told of two casings being found in the yard, Dante remembered shooting in the air as his girlfriend was swiping at the gun, dropping and picking up the gun, and then seeing people come out of the house unhappy. Dante said he could not remember what was said and was blurry about the shooting because he was pretty drunk.

As the interview continued, Dante recalled what he did in the aftermath of the shooting and what he and Smith were wearing. Dante remembered reloading the weapon after having fired it. Dante recalled wanting Smith to stay with him after the shooting. When asked about threatening

15

Smith with the gun after the shooting, Dante acknowledged that he probably threatened people not to betray him. Dante confirmed the path that he and Smith took away from No Heart housing. Dante remembered going to Andrew Slow Bear's trailer, seeing various people at the trailer, and getting into a disagreement there. Dante also remembered Baggs giving him a ride after the confrontation at the Slow Bear trailer.

When the FBI agent returned to asking about the shooting, Dante was able to draw where he was and where he thought others were at the time of the shooting. Dante remembered that a man came out of the home first and a woman followed, but that he did not know either of them. At that point in the interview, Dante said the shooting was an accident and he felt bad now, claiming he wanted to scare and not kill the man. Dante also volunteered that his own father was scared to give him the gun for fear that Dante might kill someone. When asked what he could not forget about the shooting, Dante responded that he could not forget the woman screaming after the man was shot.

Dante said that he wasn't in his right mind because he was drunk and if he had been sober he would not have done it. Dante disclaimed any idea of what his intent was. Dante said he had only previously fired the gun at a sign. Dante indicated remembering the shot and the reaction of the man. Dante recalled using both hands when he fired. Dante did not help the man whom he shot because he was scared, knowing he had "f_ _ _ed up." Toward the end of the interview, Dante said that he doesn't know whether the shooting was an accident but feels as if it was.

## III.    Discussion of "Interest of Justice" Factors

### A.  The Age and Social Background of the Juvenile

The first "interest of justice" factor is the age and social background of the juvenile. 18 U.S.C. § 5032; Juvenile Male, 889 F.3d at 453. At the time when Dante shot and killed Marcus

Antonio, Dante was sixteen years, seven months, and twenty-one days old.  Dante now is seventeen years of age and will turn eighteen on May 23, 2020.

Dante's social background sadly is not atypical for juveniles who find themselves charged in the District of South Dakota.  Dante's parents separated and Dante's father was minimally involved in his upbringing.  Dante's mother was in and out of his life, so Dante during his early years was raised in his maternal grandmother's home.  Dante's maternal grandmother, while taking in several grandchildren, struggled with alcoholism and with providing proper supervision and care to her grandchildren.  At age nine, Dante was subject to physical, and perhaps sexual, contact by a male cousin who is three and a half months younger and living in the home with Dante.

Dante's attendance at school was poor to fair, and his behavior and performance in school ranged from excellent to unacceptable.  By the time Dante was in middle school, Dante was in periodic trouble with in-school and out-of-school suspensions and with charges of juvenile delinquency in tribal court.  The tribal court records indicate that his mother and in turn Dante failed to appear for some hearings and that Dante was living with a paternal grandmother and with various others at times.  Dante had to repeat eighth grade, but showed the ability to excel academically during three of four quarters of his second year of eighth grade.  Dante's performance academically fell off in high school, and he was suspended for fighting at the time the shooting occurred.

Dante has family members who care for him, including his aunts Tannya and Tylla, as well as Dante's father's ex-wife.  Dante cares about his mother and is saddened by the absence of visits

from her. However, Dante's mother does not appear to be reliable generally or in her care for Dante.[7]

Dante has made a favorable impression on several educators, both those presently working with him at the Hughes County Jail and those who knew him in the Cheyenne River school system. Dante, however, has been involved in fights both in the Cheyenne River schools and in the Hughes County Jail.

### B. Nature of the Alleged Offenses

The second factor the Court considers is the nature of the alleged offenses. For the purpose of analyzing the nature of the alleged offenses, this Court may assume that the offenses were committed. Juvenile LWO, 160 F.3d at 1180, n. 1. Nothing of course in this Opinion and Order should be taken as any finding of fact on what was charged in the juvenile information, and this Court here is employing a preponderance of the evidence standard. United States v. CPA, 572 F. Supp. 2d 1122, 1125 (D.N.D. 2008). Under the preponderance of the evidence standard, however, there is evidence that Dante committed an utterly senseless homicide in shooting Marcus Antonio.

On January 12, 2019, Dante was in possession of a double-barreled handgun in the No Heart community of Eagle Butte. Dante had been drinking, had gone to the home of his girlfriend adjacent to the Antonio home and, whether intentionally or unintentionally, had discharged a round from the handgun behind the Antonio home. Not surprisingly, people came out of the Antonio

---

[7] Dante's mother was subpoenaed to testify and attended the first day of the transfer hearing. She did not show up for the second day. Dante's mother testified in a contradictory fashion over whether she had visited or communicated much otherwise with Dante while he has been in custody. Dante's mother also testified that she did not see Dante in the hours after the shooting, but a number of sources, including Dante himself, contradict her testimony and point to her being in a car that helped transport Dante around Eagle Butte after the shooting. Dante of course bears no blame for his mother's lack of responsibility and this Court's focus is on Dante in applying the "interest of justice" factors, but Dante's parents are part of his social background.

home to see what was going on and then to tell Dante and the other juveniles to leave. Smith told the Antonios to just go back inside. Dante then fired the handgun at Marcus Antonio striking him in the chest, after which Marcus Antonio staggered back into his kitchen and died.

Dr. Ertz's report makes clear that there may be mitigating factors, including that Dante was blacked out or at least his thinking was impaired due to his alcohol and possibly cannabis use, that Dante was suicidal, that Dante was possibly disassociating, and that Dante's diminished vision may have affected his ability to realize Marcus Antonio posed no threat to him. Dante's interview, however, undermines much of this by revealing that Dante actually remembers quite a lot about the actual shooting and his conduct before and afterwards. Dante's behavior in threatening others (Smith and then separately occupants at the Slow Bear home) with the handgun after the shooting likewise is very troubling. There arguably may be mitigating factors, but at this point, it suffices to conclude that the nature of the offenses—second degree murder, assault with a dangerous weapon, and using and carrying a firearm during and in relation to a crime of violence—weighs heavily towards transfer to adult court. The United States Court of Appeals for the Eighth Circuit has affirmed transfer where the nature of the offense was less serious. See <u>Juvenile Male</u>, 889 F.3d at 452–53. There are circumstances where the nature of the alleged offenses may weigh more heavily than other factors. See <u>United States v. Juvenile Male MC</u>, 322 F.3d 482, 483–86 (8th Cir. 2002) (affirming transfer for two seventeen-year-old juveniles who were part of a group who beat up a victim, drug him into a field, and let him lay dying for twelve hours, as part of a heinous and senseless murder). Dante's offenses hardly could be worse and weigh heavily in favor of transfer.

## C. Extent and Nature of the Prior Delinquency Record

The third factor—the extent and nature of the juvenile's prior delinquency record—does not weigh in favor of transfer, though does not weigh much against transfer either. Dante has a series of CRST arrests, but some are for minor in possession of alcohol, disorderly conduct, criminal mischief, and a pickup and hold for skipping his tribal court hearing. The arrest for arson appears to relate to burning of a hay bale. The drug charges stem from Dante living at the Slow Bear residence where drugs were sold and being there during a drug bust. The actual juvenile adjudications are three in number, one disposition requiring writing a letter of apology to Officer Blue Coat, and the other two requiring three and six months of probation respectively. While the probation may not have been intensive and was limited during the six-month period by Dante moving to Tennessee temporarily, the probation officer did not have an issue with Dante during his supervision.

There are of course instances where a prior delinquency record may not reflect the deviant behavior in which a juvenile has engaged. There is evidence that Dante affiliated himself with a gang in high school and was involved in four fights at school. Such a background and record is not unusual for those charged in juvenile cases in the District of South Dakota. There is evidence that Dante has used alcohol and marijuana over the years, but the extent and nature of his prior delinquency record is not severe enough to weigh in favor of transfer, though it again does not weigh much against transfer.

### D. Present Intellectual Development and Psychological Maturity

The fourth factor—the juvenile's present intellectual development and psychological maturity—recognizes the different levels of maturity certain juveniles may have notwithstanding their actual age. Presumably, the less psychologically mature the juvenile is, the more appropriate it is to deny a motion to transfer. See Thompson v. Oklahoma, 487 U.S. 815, 834 (1988) (stating

that there is a "broad agreement on the proposition that adolescents as a class are less mature and responsible than adults").

Dante's intellectual development seems to be on par with a person of his age. Dante is reasonably intelligent, probably able to function academically at a higher level than his IQ test result of 94 would indicate. Although he had to repeat eighth grade, doing so seemed to be a consequence of a lack of effort the first time around combined with excessive absenteeism and starting the next school year late. He exceled in eighth grade his second time through for the first three quarters, and then returned to being primarily a D student in high school. Dante certainly suffers from some decision-making errors, and Dr. Ertz's report would indicate that there are areas of his decision making that are underdeveloped. However, it is difficult to conclude that Dante is psychologically immature. He has been fending for himself and indeed at a court proceeding told the Cheyenne River school social worker that he was old enough to take care of himself, at a time when he was fourteen or fifteen years of age. The school social worker knew that Dante hung out with adults after school. None of the witnesses testified that Dante is immature for his age. Indeed, some indicated that Dante has leadership skills. This Court views Dante's intellectual development as average and does not believe Dante to be psychologically immature relative to other juveniles his age.

### E. Nature of Past Treatment Efforts and Response to Them

Unfortunately, Dante has never been in any formal treatment program. The two limited periods of supervision by a CRST probation officer do not qualify as past treatment programs. The probation officer spent a limited amount of time with Dante, and Dante did not go through any sort of substance abuse treatment or cognitive behavioral therapy as part of CRST probation or otherwise.

21

## F. The Availability of Programs Designed to Treat the Juvenile's Behavioral Problems

The BOP contracts with secure facilities where a juvenile can serve time and receive some treatment, indeed from Dr. Ertz himself if the juvenile is incarcerated in the Rapid City JSC. According to BOP representative Leukefeld, the programming differences for juveniles include a staffing ratio that is lower, a less punitive environment, and a more intensive focus on rehabilitation. However, an individual treated as a juvenile and given a disposition prior to his eighteenth birthday can only be held or supervised until age twenty-one,[8] which for Dante would be only until late May of 2023.

If a juvenile is treated as an adult, the juvenile can remain in juvenile detention through age eighteen, but then transfers to adult BOP custody. Adult custody with BOP focuses less on rehabilitation and more on housing an inmate until close to release. Of course, if this Court were to transfer Dante to adult court and if he were convicted, this Court would retain the ability to make recommendations to the BOP for placement, although the BOP then decides what to do with such recommendations.

## IV.    Conclusion and Order

Ultimately in considering the interest of justice factors, this Court must balance "the likelihood of rehabilitation before the juvenile reaches majority with the risk of harm to the public from treating violent crime more leniently." Juvenile JG, 139 F.3d at 586. If this Court denies transfer and sentences Dante before his eighteenth birthday, this Court has the authority to detain and supervise Dante only until he reaches age twenty-one, 18 U.S.C. § 5037(c), although there can

---

[8] Supervision can be extended to age twenty-four or even twenty-six depending on the juvenile's performance between the ages eighteen and twenty-one and ages twenty-one and twenty-four. 18 U.S.C. § 5037(d)(6).

be some circumstances where supervision can extend up to his twenty-sixth birthday, 18 U.S.C. § 5037(d)(6). Alternatively, if this Court transfers Dante to adult court, the federal sentencing guidelines become a sentencing factor under 18 U.S.C. § 3553(a), with a particularly high offense level calculation (and in turn guideline range) if Dante is convicted of the very serious offenses charged. This Court of course can depart or vary downward from the guideline range on account of Dante's age, U.S.S.G. § 5H1.1, although there is a ten-year mandatory minimum sentence atop of the sentence on other counts upon conviction for discharging a firearm in a crime of violence, 18 U.S.C. § 924(c)(1)(A)(iii).

What makes this decision particularly difficult is that there is no more serious crime than homicide, and Dante's shooting of a complete stranger in Marcus Antonio was heinous, cold, and utterly senseless. The nature of the offense weighs very heavily in favor of transfer. The age and social background of Dante weighs slightly in favor of transfer with Dante being older than sixteen and a half at the time of the shooting and having a troubled social background. Meanwhile, this Court finds that the intellectual development and psychological maturity, as well as the extent and nature of prior juvenile delinquency, do not weigh for transfer though they do not much weigh against transfer either. The nature of past treatment efforts and Dante's response to them is a non-factor here because of the absence of such treatment. The availability of programs to treat the juvenile's behavioral problems weighs against transfer. This Court is left weighing the "risk of harm to the public" from treating this senseless shooting leniently and the "likelihood of rehabilitation" of Dante. A practice of lenient treatment of juveniles committing murders could result in little deterrence of Dante or others from such a crime. Yet juvenile cases are not of public record, and juveniles are to be treated in a way more focused on rehabilitation than on punishment. See 18 U.S.C. § 5032.

23

Meanwhile, the "likelihood of rehabilitation" of Dante is difficult to ascertain. Dante certainly is intelligent enough to make something of himself but lacks consistent support from close family members. Dante in school settings and indeed in custody has shown himself to be able to do well, but is periodically prone to fights. He has not been through a rehabilitation program for this Court to gauge how he would respond, and the CRST probation periods were relatively brief and involved only a handful of meetings with the CRST probation officer. Again, this Court believes Dante's case to present a very difficult decision as to whether transfer should occur. Weighing all of the interest of justice factors, this Court has concluded that Dante's case should be transferred to an adult proceeding. Therefore, it is hereby

ORDERED that the Motion for Transfer, Doc. 19, is granted.


DATED this _21st_ day of January, 2020.

                              BY THE COURT:


                              ROBERTO A. LANGE
                              CHIEF JUDGE